UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JAMES ODELL HOWELL, JR., | ) | Civil Action No.: 4:13-cv-0295-BHH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| DR. FRED HOLLAND and McLEOD | ) | |
| REGIONAL MEDICAL CENTER OF | ) | |
| THE PEE DEE; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Plaintiff originally filed this action in the Court of Common Pleas, Florence County.

Defendants removed it to this court pursuant to 28 U.S.C. § 1441 based upon federal question

jurisdiction set forth in 28 U.S.C. § 1331.  Plaintiff alleges claims for employment discrimination

and retaliation pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.

He also asserts state law claims for wrongful discharge in violation of South Carolina's Workers'

Compensation Law, assault, intentional infliction of emotional distress, intentional infliction of

economic relations, and negligence/negligence per se.[1]  Presently before the court are three motions

for summary judgment: Defendant McLeod Regional Medical Center of the Pee Dee's (McLeod)

Motion for Summary Judgment (Document # 55), Defendant Dr. Fred Holland's Motion for

Summary Judgment (Document # 56), and Plaintiff's Motion for Summary Judgment (Document

# 57).  All pretrial proceedings in this case were referred to the undersigned pursuant to the

_____

[1]Plaintiff also asserted a claim for discrimination and retaliation in violation of South
Carolina's Human Affairs Law, but withdrew this claim in his Motion for Summary Judgment.

provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. This Report and Recommendation is entered for review by the district judge.

## II.    FACTS

Plaintiff began his employment at McLeod as a staff perfusionist on July 3, 1989. Pl. Dep. 26. A perfusionist operates the heart and lung machine during open heart surgeries[2] and is responsible for blood supply to the patient while on bypass. Pl. Dep. 68-69. Thus, Plaintiff necessarily works with open heart surgeons. During his employment with McLeod, Plaintiff worked with every open heart surgeon there. Pl. Dep. 32-33, 36-37. Plaintiff was promoted to the Director of Perfusionists in either 2000 or 2001. Pl. Dep. 47. As the Director of Perfusionists, Plaintiff continued working as a perfusionist and supervised four to five staff perfusionists. Pl. Dep. 62 & Ex. 8. Plaintiff was responsible for creating the work schedules of the other perfusionists, scheduling vacations and writing performance evaluations. Pl. Dep. 63. During his employment, Plaintiff consistently received "successful" (the second-highest rating) or "role model" (the highest rating) evaluations. Pl. Performance Appraisals (Ex. 4 to Pl. Motion). He was never the subject of any disciplinary action taken by McLeod. Carr. Dep. 117 (Ex. 5 to Pl. Motion).

Dr. Holland arrived at McLeod in 2007. Pl. Dep. 72. At that time, the cardiothoracic practice group at McLeod consisted of Dr. Jones, Dr. Phillips, and Dr. Holland. Pl. Dep. 74. Dr. Phillips left McLeod in October 2008, leaving only two open heart surgeons. Dr. Holland requested

---

[2]There are a number of individuals involved in an open heart procedure, including the surgeon, physician's assistant, CRNAs, RNs, CSTs, and a perfusionist. Pl. Dep. 64-65. An anesthesiologist also oversees each open heart surgery, but might be overseeing two or three surgeries at the same time. Pl. Dep. 65-66. If a physician gives an order, the perfusionist must follow it. Pl. Dep. 66.

that Plaintiff work on his more-complicated cases[3] and Plaintiff did so at the direction of Dr. Michael Rose, Vice President of Surgical Services and Plaintiff's supervisor, and Marie Segars, Senior Vice President of McLeod Health.  Pl. Dep. 37-38.  Plaintiff testified that all of the perfusionists could handle any case in the department, but acknowledged that he was the Director of Perfusionists and had more experience than anyone else in the department.  Pl. Dep. 39-40.

Plaintiff testified that medicine is not an exact science and physicians often disagree on particular procedures and how certain procedures ought to be performed. Pl. Dep. 70-71.  Other staff in the operating room can raise concerns as well.  If there is an issue with patient safety during a procedure the perfusionist can bring it to the physician's attention right away.  Pl. Dep. 67-68.  If it is an issue that can wait, the perfusionist will not interrupt the surgeon during the procedure, but will have discussions afterwards. Pl. Dep. 67-68.  During his employment, Plaintiff brought clinical concerns he had regarding Dr. Holland, as well as other physicians, to McLeod's attention.  Pl. Dep. 69-70.   Several anesthesiologists also had disagreements with Dr. Holland over some of the techniques Dr. Holland used during his open heart surgeries.  Rose Dep. 17-18 (Ex. D to McLeod Motion). Those issues were brought to the attention of McLeod's Quality Operations Committee. Segars Dep. 18-19, 22, 129 (Ex. C to McLeod Motion); Rose Dep. 20, 28-29.  In addition, during Dr. Holland's employment, McLeod had a relationship with the Cleveland Clinic where the Cleveland Clinic would provide oversight and recommendations regarding medical procedures and outcomes with McLeod's heart surgeries.  Rose Dep. 19, 28; Segars Dep. 18-20.

At some point prior to the September 22, 2011, incident giving rise to this action, Plaintiff

_____

[3]Plaintiff testified that, although Dr. Holland thought his cases were more difficult that those of the other surgeons, Plaintiff felt that Dr. Phillips's cases were equally difficult.  Pl. Dep. 37-38.

and Dr. Holland appeared to others to have a good working relationship and also exercised together at the McLeod Health and Fitness Center. Segars Dep. 97; Rose Dep. 103; Irvin Dep. 77-78 (Ex. E to McLeod Motion); Holland Dep. 47 (Ex. F to McLeod Motion). However, Plaintiff testified that in April of 2010, he was afraid for his personal safety and the safety of patients while he was working under Dr. Holland's direction. Pl. Dep. 108-09. Plaintiff had seen outbursts by Dr. Holland and confrontations between Dr. Holland and other physicians, during which Dr. Holland used profanity. Pl. Dep. 109. During this time, Dr. Holland approached Plaintiff and asked Plaintiff if he was afraid of him. Pl. Dep. 107. Plaintiff responded that he was not afraid of him but felt uncomfortable sometimes. Pl. Dep. 107. Plaintiff felt threatened during this conversation. Pl. Dep. 107-08. Plaintiff did not inform anyone at McLeod at that time that he felt threatened by Dr. Holland. Pl. Dep. 110.

However, a former employee at McLeod, Jim Jowers, complained in 2009 that Dr. Holland created an uncomfortable work environment in the CVOR (cardiovascular operating room) and was very critical of Mr. Jowers' clinical practice. Carr Dep. 15, 24 (Ex B. to McLeod Motion). Shannon Carr, Human Resource Manager, interviewed a number of employees in the CVOR in response to Mr. Jowers complaint. During this interview process, Ms. Carr received concerns about Dr. Holland's conduct, including allegations that he made inappropriate sexual jokes and comments, he was "mean," "ugly," "hateful," "a terrible person," "a jerk," "an ass," and "not a good human being," and that individuals in the CVOR did not bring concerns of patient care to his attention for fear of retaliation. 2009 Investigation re Dr. Holland (Ex. 6 to Pl. Motion); Carr Dep. 23-25. Ms. Carr reported on October 30, 2009, that she was "very concerned that these ongoing issues [with Dr. Holland] [we]re putting McLeod at risk for potential EEOC charges and legal concerns over hostile

work environment and sexual harassment..." 2009 Investigation re Dr. Holland; Carr Dep. 32-36. After the investigation, Ms. Segars spoke to Dr. Holland and he was open to behavior changes and suggestions for improving his relationship with the team. 2009 Investigation re Dr. Holland. For six to eight months following this investigation, Ms. Carr periodically checked back in with the CVOR staff and was repeatedly told that everything had ceased and their work environment was positive. Carr Dep. 188.

On September 19, 2011, Plaintiff assisted Dr. Holland on a patient's open-heart surgery. Pl. Dep. 152. During the surgery, Plaintiff became concerned with Dr. Holland's use of a "pump sucker" device following the administration of Protamine. Letter from Pl. to Carr (Ex. 15 to Pl. Motion). After the procedure, once the patient was off bypass, Plaintiff discovered a blood clot in the reservoir of the heart and lung machine. Pl. Dep. at 153. Plaintiff took a picture of the reservoir on his phone and showed it to the anesthesiologist who had been working the case, Dr. Douglas McPherson. Pl. Dep. at 155. Plaintiff attempted to contact Dr. Rose shortly thereafter, but was not able to do so until the next day. Pl. Dep. 155. Dr. Rose asked Plaintiff to give him the pictures and that he would see this matter forward. Pl. Dep. 161. Dr. Rose did some research and drafted a letter to Dr. Holland and reviewed it with Plaintiff before it was sent to Dr. Holland. Pl. Dep. 161-162.

Dr. Holland received the letter from Dr. Rose on September 22, 2011, and called Plaintiff to ask Plaintiff why he didn't discuss his clinical issues with Holland directly (hereinafter, "the phone call"). Holland Dep. 62-64, 72-74-76, 110. Plaintiff was at McLeod when Dr. Holland called another employee's cell phone looking for Plaintiff. Pl. Dep. 275. Plaintiff spoke to Dr. Holland and the conversation lasted approximately 5 minutes. Pl. Dep. 276-278. Plaintiff found Dr. Holland to be extremely aggressive and abusive toward him during the call. Pl. Dep. 165-178, 261-264,

275-290; Letter from Pl. to Carr. Plaintiff remembers Dr. Holland saying that "he was fucking with the wrong person," that he "would be watching and waiting for [him] to fuck up," and that when Plaintiff "fucked up, [he] would be there and [he] would fuck [him] up." Letter from Pl. to Carr.

Following the phone call, Plaintiff had conversations with both Dr. Rose and another doctor. Letter from Pl. to Carr, Pl. Dep. 165-178, 261-264, 275-290. Thereafter, Plaintiff spoke with Ms. Carr and detailed the incident in a formal letter to her. Letter From Pl. to Carr. During his meeting with Ms. Carr, Plaintiff informed Ms. Carr that he refused to work with Dr. Holland. Carr Dep. 111, 119. As the Director of Perfusionists, Plaintiff was able to change the perfusionist schedule starting on September 27, 2011, so that he was only scheduled to work Dr. Jones' cases. Pl. Dep. at 178. Plaintiff never worked on a surgical case with Dr. Holland after September 22, 2011. Pl. Dep. at 179. On October 24, 2011, Dr. Holland sent a letter to Plaintiff apologizing for the phone call. Letter from Holland to Pl. (Ex. 23 to Pl. Motion). Plaintiff continued to schedule himself for surgeries only with Dr. Jones through the end of November 2011. However, Dr. Holland was performing eighty percent of the open heart surgeries at the time and, thus, by working only with Dr. Jones, Plaintiff had substantially reduced his caseload. Carr Dep. 121; Irvin Dep. 56; Segars Dep. 53. Dr. Rose, an anesthesiologist, provided Plaintiff with some additional non-perfusionist projects during this two month period, as well as the opportunity to perform some cell salvages in another part of the hospital. Pl. Dep. 182-183. However, by working only twenty percent of the open heart surgeries, Plaintiff created a hardship on the other perfusionists, who were left to handle eighty percent of all open heart cases and Dr. Holland's entire call schedule.[4] Pl. Dep. 201; Carr Dep. 99; Segars Dep. 57.

---

[4] Dr. Holland took call every other night and every other weekend. (Holland Dep. 34).

During this two month time period, McLeod did another investigation into the work environment in the CVOR. Irvin Dep. 22-23; Rose Dep. 65. McLeod's investigation ultimately determined that there was no evidence of a hostile work environment and that as many people complained about Dr. Jones' behavior and use of profanity as they did Dr. Holland. Carr Dep. 185; Segars Dep. 32-33, 139 & Ex. 7. During this timeframe, McLeod was also reviewing the clinical issue that was brought to Dr. Rose's attention concerning the clot in the reservoir with the Quality Committee and the Cleveland Clinic. Irvin Dep. 23.

On November 23, 2011, Ms. Segars met with Plaintiff and informed him that McLeod had completed its investigation which had concluded that the CVOR was not a hostile work environment, Dr. Holland had apologized to Plaintiff in writing, and it was time for Plaintiff to return to work performing his full duties as Director of Perfusionists, including working with Dr. Holland, on or before November 28, 2011. Segars Dep. 69-71, 75. Ms. Segars informed Plaintiff that McLeod would provide Dr. Irvin or Dr. Rose to be available in the CVOR for a transitional period until Plaintiff was comfortable working with Dr. Holland again. Segars Dep. 69-71; Rose Dep. 83, 95; Irvin Dep. 32-33.

Plaintiff first sought medical treatment on October 27, 2011, at the request of his wife, April Howell[5], because Plaintiff was anxious, sleepless, losing weight, depressed and generally did not have any interest in life. Pl. Dep. 181-82. Dr. Krista Kozacki assessed him with acute stress, fatigue and malaise. Hope Health Medical Excuse (Pl. Dep. Ex. 15). On November 23, 2011, the day Plaintiff was informed that he should return performing his full duties as Director of Perfusionists,

---

[5]April Howell also worked at McLeod and was the Assistant Director of the OR during this time. Pl. Dep. 55.

Dr. Kozacki wrote an excuse for a medical leave of absence for forty-five days, until January 2, 2012. Hope Health Medical Excuse. Plaintiff was placed on FMLA leave. Leave of Absence Documents (Pl. Dep. Ex. 10). Plaintiff remained on a leave of absence and exhausted his FMLA leave in February 2012. Although Dr. Kozacki released Plaintiff to return to work on February 15, 2012, with the restriction that Plaintiff not be required to work with Dr. Holland, Plaintiff continued on a non-FMLA medical leave of absence pursuant to McLeod's medical leave of absence policy. Leave of Absence Documents.

In January of 2012, Plaintiff applied for workers' compensation benefits. Workers' Compensation Pleadings (Ex. 22 to Pl. Motion). McLeod admitted that Plaintiff sustained a mental injury and was in need of additional treatment. Workers' Compensation Pleadings. Plaintiff also filed complaints with the South Carolina Board of Medical Examiners and the Occupational Safety and Health Administration in January of 2012. South Carolina Board of Medical Examiners Complaint (Ex. 29 to Pl. Motion); Occupational Safety and Health Administration Complaint (Ex. 30 to Pl. Motion).

On January 30, 2012, counsel for Plaintiff formally requested from McLeod an accommodation pursuant to the ADA that Plaintiff's work schedule be modified so that he would no longer be required to work with Dr. Holland. Pl. Request for Accommodations (Ex. 31 to Pl. Motion). In the alternative, counsel requested that the parties engage in an "interactive process" to "identify the purpose and essential functions of his job; identify the precise job-related limitation imposed by his disability; identify other possible accommodations; assess the reasonableness of each option based on effectiveness, reliability, and timeliness of instituting the option; and implement the most appropriate accommodation for both the hospital and [Plaintiff]." Pl. Request for

-8-

Accommodations. On January 31, 2012, Ms. Carr wrote to Plaintiff reiterating the accommodations that had already been offered and inviting Plaintiff to contact her to review his medical condition and any other options that might be available. McLeod Response to Pl. Request for Accommodations (Ex. 32 to Pl. Motion).

On February 21, 2012, counsel for Plaintiff again requested that Plaintiff's work schedule be modified so that he would no longer be required to work with Dr. Holland. Pl. 2nd Request for Accommodations (Ex. 33 to Pl. Motion). Ms. Carr notified Plaintiff that McLeod could not accommodate his request not to work with Dr. Holland and provided Plaintiff with contact information to attempt to locate a transfer within McLeod. McLeod Response to Pl. 2nd Request for Accommodations (Ex. 34 to Pl. Motion). Ms. Carr also notified Plaintiff that his leave of absence expired May 28, 2012, and his employment would be discontinued at that time if he was unable to secure transfer to another position that could accommodate his restriction. McLeod Response to Pl. 2nd Request for Accommodations. Plaintiff completed an Employment Initial Inquiry Questionnaire with the South Carolina Human Affairs Commission on April 25, 2012, did not secure transfer to another position, and his employment was terminated effective May 28, 2012. He filed a Charge of Discrimination with the EEOC on June 10, 2012. Charge Documents (Ex. 14 to Pl. Dep.).

## III.     STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. at 322.

-9-

Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); <u>Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  <u>Barber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  <u>Mitchell v. Data General Corp.</u>, 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  <u>See</u> <u>Celotex</u>, 477 U.S. at 324.  Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); <u>see</u> <u>also</u> <u>Cray Communications, Inc. v. Novatel Computer Systems, Inc.</u>, 33 F.3d 390 (4th Cir. 1994); <u>Orsi v. Kickwood</u>, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

IV.    **DISCUSSION**

A.    **ADA**

1.    **Failure to Accommodate**

Plaintiff argues that McLeod failed to make reasonable accommodations for his disability that would allow him to return to work.  The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The ADA places an affirmative obligation on employers to make reasonable accommodations for qualified individuals if such accommodation will enable the employee to successfully perform the job in question. 42 U.S.C. § 12111(8). Violations of the ADA occur when the employer fails to make reasonable accommodations for a qualified individual with a disability. Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001).  "In a failure to accommodate case, a plaintiff establishes a prima facie case by showing '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations.'" Rhoads, 257 F.3d at 387 n. 11 (quoting Mitchell v. Washingtonville Ctr. Sch. Dist., 190 F.3d 1, 6 (2d Cir.1999)).  Plaintiff argues that no genuine issue of material fact exists that he meets all four of these requirements.  McLeod argues that Plaintiff fails to meet the first, third and fourth requirements.

For purposes of the ADA, a person is disabled when he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record

-11-

of such an impairment; or (C) [is] ... regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).  Plaintiff asserts that he has a mental impairment as a result of his depression, PTSD, stress, fatigue/malaise, and anxiety as evidenced by his approval for workers' compensation and short term disability benefits.  Depression and anxiety are impairments recognized by the ADA. See, e.g., Baird ex rel. Baird v. Rose, 192 F.3d 462, 467 n. 3 (4th Cir.1999); Rohan v. Networks Presentations LLC, 175 F.Supp.2d 806, 812 (D.Md.2001);  Hamilton v. Southwestern Bell Tel. Co., 136 F.3d 1047, 1050 (5th Cir.1998); Battle v. United Parcel Service, Inc., 438 F.3d 856, 861–62 (8th Cir.2006).  Not every impairment, however, constitutes a disability. 29 C.F.R. § 1630.2(j)(1)(ii).  "A medical diagnosis of depression is not the 'sin[e] qua non' of having an ADA disability," Dean, 309 F.Supp.2d at 593, and alleging the existence of an impairment "without showings of substantial limitation to major life activities would not qualify Plaintiff as disabled." Lipscomb v. Techs., Servs. & Info., Inc., No. DKC 09–3344, 2011 WL 691605, at *12 (D.Md. Feb.18, 2011); see also Dunbar v. Byars, No. 2:11–cv–2243–JFA–BHH, 2013 WL 667930, *3 (D.S.C. January 30, 2013).

Although the ADA does not define "major life activities," the Fourth Circuit interprets them to be "activities that are of central importance to daily life" and "that the average person in the general population can perform with little or no difficulty." Rohan v. Networks Presentations, LLC, 375 F.3d 266, 274 (4th Cir.2004). The regulations provide a non-exhaustive list of major life activities, including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(I).  "Substantially limits" is to be "construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA" and "is not meant to be a demanding

standard." 29 C.F.R. § 1630.2(j)(1)(I).  To "be substantially limited in the major life activity of working ... one must be precluded from more than one type of job, a specialized job, or a particular job of choice ... [and] if jobs utilizing an individual's skills ... are available, one is not precluded from a substantial class of jobs."  Taylor v. Federal Express Corp., 429 F.3d 464, 464 (4th Cir. 2005); see also Hill v. Southeastern Freight Lines, Inc., 877 F.Supp.2d 375, 389 (M.D.N.C. 2012) ("[I]n order to show that he was substantially limited in the major life activity of working, Plaintiff must show that he was precluded from a substantial class of jobs or a broad range or jobs on account of his eye condition.");  Allen v. SouthCrest Hosp., 455 Fed.Appx. 827, 835 (10th Cir.2011) (finding that the plaintiff, "even after the enactment of the [ADA Amendments Act of 2008] and the modified EEOC regulations" must show that she was "substantially limited in performing a class of jobs or broad range of jobs" in order to establish that she is substantially limited in the major life activity of working).

It strains credulity to conclude that Plaintiff is substantially limited in the major life activity of working simply because he cannot work with Dr. Holland.  There is no evidence that Plaintiff's impairments prevent him from working as a perfusionist.  He continued to work as a perfusionist for Dr. Jones for two months following the phone call with Dr. Holland and one month after his doctor assessed him with the impairments he claims causes his disability.  He was also able to do the few other tasks Dr. Rose was able to find for him in other parts of the hospital.  He sought medical leave only after he was informed that he would have to start working with Dr. Holland again. Furthermore, when his doctor released him to return to work in February of 2012, his only restriction was that he not work with Dr. Holland.  Finally, upon his termination of employment from McLeod,

Plaintiff soon after[6] found employment as a perfusionist at the UVA Medical Center and continues to hold that position.  Pl. Dep. 16, 371-72.  McLeod points to several courts that have held that not being able to work with a particular individual or supervisor does not substantially limit the major life activity of working.  See Schneiker v. Fortis Insurance Company, 200 F.3d 1055, 1062 (7th Cir. 2000)(personality conflict with supervisor does not establish disability even where supervisor caused employee's depression);  Weiler v. Household Finance Corp., 101 F.3d 519, 525 (7th Cir. 1996)(employee was not disabled under the ADA where she could not work only with a certain supervisor because "if she can do the same job for another supervisor, she can do the job, and does not qualify under the ADA");  Hatfield v. Quantum Chemical Corp., 920 Fed. Supp. 108, 110 (S.D. Tx 1996)(not being able to work with supervisor did not substantially limit major life activity);  Flynt v. Biogen Idec, Inc., No. 3:11-cv-22-HTW-LRA, 2012 WL 4588570, *4-5 (S.D.Miss. Sept. 30, 2012) (the inability to work with a specific person does not establish a disability nor does an employer have a duty under the ADA to accommodate such a restriction). As the District Court for the Southern District of Mississippi noted, the ADAAA (ADA Amendments Act), which amended the ADA in 2008, did not change the definition of disability or make all mental or physical impairments disabilities:

> Even under the amendments, a disability is defined as "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 12102(1). Not being able to work with Richards, as a matter of law, does not substantially limit any major life activity of working. …The conflicts plaintiff had with Richards [his supervisor], even if they caused depression and stress, simply cannot establish disability under the law.

Flynt, 2012 WL 4588570 at *5 (emphasis in original).  Simply put, Plaintiff's inability to work with

---

[6]Plaintiff indicates in his deposition that he began the position on March 19, 2012, which would have been before his termination from McLeod on May 28, 2012.  Pl. Dep. 16.

Dr. Holland is insufficient to show that he is substantially limited in any major life activity.  It shows only that Plaintiff is unable to work with one person, not that he is in any way limited in performing the requirements for his job as a perfusionist or any other job.  Thus, Plaintiff fails to show that he is disabled within the meaning of the ADA.

In response to McLeod's motion, Plaintiff also argues that McLeod regarded him as being disabled.  "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  Plaintiff argues that McLeod regarded him as having a disability because it did not provide him with his request to not work with Dr. Holland.  However, to the contrary, the fact that McLeod welcomed Plaintiff to continue performing his full duties as the Director of Perfusionists reveals that it did not regard him as having any disability.  Plaintiff's supervisors felt Plaintiff was fully capable of performing his duties as the Director of Perfusionists. During her discussion with Plaintiff in November of 2011, prior to him taking medical leave, Ms. Segars told Plaintiff "we think you can be successful here" and asked him to return to his duties as the Director of Perfusionists.  Segars Dep. 70.  At that time, Ms. Segars was unaware that Plaintiff had sought medical treatment for any mental impairments.  Segars Dep. 70. Even after Plaintiff took medical leave, there is no indication that McLeod felt Plaintiff was unable to perform his duties as a perfusionist.  An employer's knowledge of an impairment is insufficient to show that the employer regarded the employee as having a disability.  See, e.g., Haulbrook v. Michelin North America, 252 F.3d 696, 703 (4th Cir.2001) (citing Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir.1996)).  Thus, Plaintiff's "regarded as" argument fails as well.

-15-

Because Plaintiff fails to show that he has a disability as defined under the ADA, his claim fails. Nevertheless, assuming arguendo, he does have a disability, he still fails to show that he was a "qualified individual" with a disability or that McLeod failed to make a reasonable accommodation that would have allowed Plaintiff to remain in his position as a perfusionist.

To be a qualified individual with a disability, an employee must be "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). McLeod argues that one of the essential functions of the Director of Perfusionist at McLeod was to work with Dr. Holland because he performed the majority of the open heart surgeries at McLeod. Because Plaintiff would not or could not work with Dr. Holland, he could not perform an essential function of the position. Plaintiff does not dispute that working with Dr. Holland was an essential function of the position he held[7], nor does he identify any other position that he "desires." Courts have held that being able to work with one's supervisor or co-employee is an essential job function and the inability of a plaintiff to perform such an essential job function means the plaintiff is not a "qualified individual" under the ADA. See Gaul v. Lucent Technologies, 134 F.3d 576, 581 (3rd Cir. 1998)(refusal to work with co-employee that allegedly caused the plaintiff stress meant the plaintiff was not a "qualified" individual under the ADA); Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 384 (2nd

---

[7]Plaintiff argues that he could perform the duties of a perfusionist as evidenced by the fact that he secured employment as a perfusionist at another hospital following his termination from McLeod. However, with respect to whether someone is a "qualified individual, essential functions are job-specific, not occupation-specific, and evidence that a job function is essential includes, but is not limited to the employer's judgment as to which functions are essential, the amount of time spent on the job performing the function, the experience of other employees in that position, and the consequences of not requiring the person to perform the function. Fleetwood v. Harford Sys., Inc., 380 F.Supp.2d 688, 698–99 (D.Md.2005) (citing 29 C.F.R. 1630.2(n)(3)).

Cit. 1996)(essential function of the plaintiff's job was to work under her assigned supervisor); Prichard v. Dominguez, 2006 WL 1836017 (N.D. Fla. June 29, 2006)(the plaintiff was not a "qualified individual with a disability" when she refused to work with the Major which was an essential function of her job as Deputy Director of Public Affairs).  For these reasons, Plaintiff fails to make this showing as well.

Finally, Plaintiff's evidence is insufficient to show that McLeod failed to make a reasonable accommodation that would have allowed Plaintiff to remain in his position as a perfusionist.  The evidence reveals, that following two months of allowing Plaintiff to work only with Dr. Jones and on other projects in other areas of the hospital, McLeod determined that Plaintiff needed to return to working with Dr. Holland to fulfill the essential functions of his position because, as Ms. Carr testified, "since Dr. Holland does eighty percent of the procedures in [Plaintiff's] work area, its obviously not practical to continue him in a full-time job not allowing him to work in eighty percent of the procedures." Carr Dep. 121.  When Ms. Segars first discussed this with Plaintiff in November of 2011, Plaintiff informed her that he was not going to be able to work with Dr. Holland.  Segars Dep. 70.  Segars offered to keep someone in the operating room with Plaintiff and Dr. Holland for a period of time until they could get back on "good footing," and Plaintiff did not think this was a good idea, either.  Segars Dep. 70-71.  Plaintiff decided to take medical leave instead, which McLeod allowed.

Plaintiff made a formal request for accommodation, through counsel, on January 30, 2012. He requested that "either his job be restructured and/or his work schedule be modified such that he no longer be required to work with Dr. Jamie Holland."  Pl. Request for Accommodations (Ex. 31 to Pl. Motion).  In the alternative, counsel requested that the parties engage in an "interactive

-17-

process" to "identify the purpose and essential functions of his job; identify the precise job-related limitation imposed by his disability; identify other possible accommodations; assess the reasonableness of each option based on effectiveness, reliability, and timeliness of instituting the option; and implement the most appropriate accommodation for both the hospital and [Plaintiff]." Pl. Request for Accommodations. On January 31, 2012, Ms. Carr wrote to Plaintiff reiterating the accommodations that had already been offered–(1) returning to his full time duties, including working with Dr. Holland, with another McLeod employee in the operating room for a limited time or (2) taking a leave of absence pursuant to McLeod's leave policy until he was comfortable returning to perform the essential functions of his position–and inviting Plaintiff to contact her to review his medical condition and any other options that might be available. McLeod Response to Pl. Request for Accommodations (Ex. 32 to Pl. Motion).

On February 21, 2012, counsel for Plaintiff again requested that Plaintiff's work schedule be modified so that he would no longer be required to work with Dr. Holland. Pl. 2nd Request for Accommodations (Ex. 33 to Pl. Motion). Ms. Carr notified Plaintiff that McLeod could not accommodate his request not to work with Dr. Holland and provided Plaintiff with contact information to attempt to locate a transfer within McLeod. McLeod Response to Pl. 2nd Request for Accommodations (Ex. 34 to Pl. Motion).

An employee is not entitled to the accommodation of his choice. See Crawford v. Union Carbide Corp., 202 Fed 3d 257 (4th Cir. 1999); Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285–86 (11th Cir.1997) ("[a] qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation."). While an employee's preference for one accommodation over another may be taken into account, "the

employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. § 1630.9 app. Indeed, the accommodation chosen by the employer need not be the " 'best' accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated." Id.; see also Corrigan v. Perry, No. 97–1511, 1998 WL 129929, at *9 (4th Cir. March 24, 1998).

McLeod offered two options to accommodate Plaintiff. Plaintiff took advantage of the leave provided by McLeod, but once that leave expired, declined to return to work under the other option offered, that is, to ensure that another McLeod employee was in the operating room with Plaintiff and Dr. Holland for a period of time until Plaintiff felt comfortable working with him. Mrs. Carr also offered to and did meet with Plaintiff to discuss whether other options were available. However, the only accommodation acceptable to Plaintiff was that he not be required to work with Dr. Holland. This request was unreasonable since Plaintiff's job as a perfusionist was to work the heart and lung machine during open heart surgeries and Dr. Holland performed eighty percent of the open heart surgeries at McLeod. It also created an undue hardship on the other two perfusionists as they had to cover the entire call rotation schedule. Carr Dep. 99; Segars Dep. 66. See Wiggins v. Davita Tidewater LLC, 451 Fed. Supp. 2d 789, 799 (E.D. Va. 2006) (holding that an employer may avoid making an accommodation by showing that the request for accommodation would impose an undue burden or hardship upon the organization); Shin v. University of Maryland Medical System Corp, 369 Fed. Appx. 472, 482 (4th Cir. 2010)(citing Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995)) (holding that the ADA does not require an employer to make an accommodation that would require other employees to worker harder or longer hours). In Wiggins, the District Court

-19-

for the Eastern Division of Virginia held that it is not a reasonable accommodation to require the employer to transfer an employee away from a supervisor even if the supervisor is the individual who allegedly created the stressful environment for the employee.  Id.  See also, Gaul v. AT&T Inc., 955 Fed. Supp. 346, 352-353 (D.N.J. 1997)(finding that an employee's request for a transfer away from a particular supervisor was unreasonable and imposed an undue burden on the employer); E.E.O.C., Revised Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act (Oct. 2002), available at www.eeoc.gov/policy/docs/accommodation.html ("Question 33: Does an employer have to change a person's supervisor as a form of reasonable accommodation? Answer: No. An employer does not have to provide an employee with a new supervisor as a reasonable accommodation.").

Furthermore, simply because an employer chooses to temporarily accommodate an employee with a disability by eliminating essential duties, the employer may not be required to continue such an accommodation permanently, especially when another reasonable accommodation has been provided. See Winfrey v. City of Chicago, 259 F.3d 610, 616 (7th Cir.2001) ("If an employer bends over backwards to accommodate a disabled worker ... it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.") (internal citations omitted); Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1528 (11th Cir.1997) (holding that an employer was not required to continue to excuse detective with visual impairment from collecting evidence at crime scene); Laurin v. Providence Hosp., 150 F.3d 52, 60–61 (1st Cir.1998) ("An employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly

-20-

onerous.").

Simply put, Plaintiff appears to be using the ADA in effort to choose the doctors with whom he will work. The protections of the ADA are no so far-reaching. See Weiler v. Household Finance Corp., 101 F.3d 519 (7th Cir. 1996) ("The ADA does not require [the employer] to transfer [plaintiff] to work for a supervisor other than [his current supervisor] . . . . [Plaintiff]'s solution is that she return to work under a different supervisor. But that decision remains with the employer. In essence, [Plaintiff] asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility."). McLeod found Plaintiff's requested accommodation unworkable, offered other available accommodations, and, when those were rejected by Plaintiff, met with Plaintiff in an attempt to brainstorm mutually agreeable options. Finally, McLeod provided Plaintiff with a dedicated recruiter to help Plaintiff find a another position within the hospital, which they were unable to do. McLeod offered reasonable accommodations and engaged in an interactive process with Plaintiff in an attempt to reach a workable solution. Plaintiff fails to show that McLeod's conduct runs afoul of the ADA in this respect. Therefore, summary judgment in favor of McLeod is appropriate on Plaintiff's ADA failure to accommodate claim.

### 2.    Retaliation

Plaintiff also argues that McLeod terminated Plaintiff's employment in retaliation for his complaints. The ADA's retaliation provision provides, in relevant part, that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

-21-

To establish a prima facie retaliation claim under the ADA, a plaintiff must allege that (1) he engaged in conduct protected by the ADA, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action. Rhoads v. F.D.I.C., 257 F.3d 373, 392 (4th Cir.2001). Plaintiff argues that he filed complaints with the South Carolina Human Affairs Commission and EEOC and was terminated one month later. Plaintiff filed an Employee Initial Inquiry Questionnaire with the South Carolina Human Affairs Commission on April 26, 2012, and his employment was terminated on May 28, 2012. His Charge of Discrimination with the EEOC was not filed until June 10, 2012. McLeod argues that it did not receive notice of any complaint of any violations of the ADA until Plaintiff's June 10, 2012, Charge was served on June 18, 2012.

To establish the causation element of a retaliation claim, Plaintiff must establish that he would not have suffered adverse employment action "but for" his protected activity. Moore v. Reese, 817 F. Supp. 1290, 1299 (D. Md. 1993). The "but for" standard "is a rigorous standard of proof." Id. It is axiomatic that an employee's protected activity cannot be the "but for" cause of an adverse employment action if the employer was unaware of the protected activity at the time of the adverse action. Nevertheless, even assuming McLeod was aware of the Initial Inquiry Questionnaire Plaintiff submitted to the South Carolina Human Affairs Commission prior to his termination, Plaintiff still fails to establish a causal connection between this action and his termination. In a letter dated February 21, 2012, Mrs. Carr notified Plaintiff that his medical leave of absence would expire on May 28, 2012, and if he was unable to secure another position within the organization that could accommodate his restriction by that date, his employment would be discontinued. This date was decided upon prior to his protected activity, and Plaintiff was aware of this date prior to submitting the Questionnaire. To satisfy the "but for" standard, Plaintiff must show more than a simple

coincidence. Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995). "Causation requires the employer's action to be the consequence of the protected activities and of nothing else." Id. Plaintiff fails to make this showing. Plaintiff's termination date coincided with the expiration of his leave, and, thus, was not the consequence of his protected activity. Therefore, summary judgment is appropriate in McLeod's favor on Plaintiff's ADA retaliation claim.

### B.     State Law Claims

If the district judge accepts this Report and Recommendation, the original federal jurisdiction claims will be dismissed and the only remaining claim will be Plaintiff's state law claims. Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). See also, e.g., United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Revene v. Charles County Comm'rs, 882 F.2d 870, 875 (4th Cir.1989). Therefore, the undersigned recommends that the district judge decline to retain jurisdiction over Plaintiff's state law claims and remand this action to the Court of Common Pleas, Florence County.

## V.     CONCLUSION

For the reasons discussed above, it is recommended that McLeod's Motion for Summary Judgment (Document # 55) be granted with respect to Plaintiff's sixth cause of action against McLeod for unlawful discrimination/retaliation in violation of the ADA and Plaintiff's Motion for

Summary Judgment (Document # 57) be denied with respect to that same cause of action.  It is further recommended that the court decline to exercise jurisdiction over Plaintiff's remaining state law claims, including those claims on which Dr. Holland has moved for summary judgment, and that this action be remanded to the Court of Common Pleas, Florence County, for further adjudication.

s/Thomas E. Rogers, III<br>Thomas E. Rogers, III<br>United States Magistrate Judge

August 12, 2014
Florence, South Carolina